UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
LONG ISLAND THORACIC SURGERY,
P.C. AND SHAHRIYOUR ANDAZ, M.D.,

                                    Plaintiffs,                    **REPORT AND RECOMMENDATION**

               -against-                      CV 17-163 (SJF)(AYS)

BUILDING SERVICE 32BJ HEALTH FUND,

                                  Defendant.
-------------------------------------------------------------X

**SHIELDS, Magistrate Judge:**

       Plaintiffs Long Island Thoracic Surgery, P.C. ("LI Thoracic") and Shahriyour Andaz, M.D. ("Dr. Andaz") (collectively "Plaintiffs") commenced this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq. In the Amended Complaint, Plaintiffs allege that Defendant Building Service 32BJ Health Fund (the "Fund" or "Defendant") violated ERISA by failing to pay Plaintiffs for medical services provided by the Plaintiffs to three beneficiaries of the Fund. Plaintiffs also bring state law claims sounding in breach of express and implied contract, unjust enrichment, violation of New York Insurance Law § 3224-a (the "Prompt Pay Law"), and defamation.

       Presently before this court, upon referral for report and recommendation by the Honorable Sandra J. Feurstein, see Docket Entry ("DE") dated December 28, 2018, is Defendant's motion for summary judgment to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 56. DE [37].

       For the reasons set forth below it is respectfully recommended that Defendant's motion be granted in part and denied in part.

<u>FACTUAL BACKGROUND</u>

I.    <u>Basis of Facts Recited Herein</u>

The facts set forth below are drawn largely from the parties' statements of material facts submitted pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Rule 56.1 Statements"). The facts are undisputed unless otherwise noted.

The Court turns to discuss the facts relied upon by the parties in connection with the present motion.

II.    <u>The Parties</u>

Plaintiff LI Thoracic is a New York professional corporation with its principal place of business located at 444 Merrick Road, Suite 380, Lynbrook, New York. Amended Complaint ("Am. Compl.") ¶ 3, DE [9]. LI Thoracic employs physician assistants ("PA"), to assist in examining, diagnosing, and treating patients. <u>Id.</u> ¶ 5.

Dr. Andaz is a New York licensed and board-certified physician affiliated with LI Thoracic. <u>Id.</u> ¶ 4. Dr. Andaz specializes in complex chest cancer procedures and robotic assisted and minimally invasive thorascopic surgery. <u>Id.</u> ¶ 7. Dr. Andaz serves as the Director of the Thoracic Oncology program at South Nassau Communities Hospital ("SNCH"). <u>Id.</u> ¶ 6. During the relevant time period, Dr. Andaz maintained privileges at SNCH and Mercy Medical Center ("Mercy") to provide medical services to patients. <u>Id.</u> ¶ 9.

The Fund is a corporation duly organized under the laws of New York State. Am. Compl. ¶ 10. The Fund is a jointly administered benefit fund established pursuant to the Taft-Hartley Act, 29 U.S.C. § 186. It is administered by an equal number of management and union trustees,

The Fund is governed by a Declaration of Trust and Plan, administered by the Trustees. The

Trust Agreement provides:

> Article V Section 1. Administrative Powers. The Trustees shall have all the general and incidental powers necessary or appropriate to proper administration of the Plan, and the Trust Fund . . . Included within such Trustee powers, but not by way of limitation, shall be the power:
>
> a.    To adopt a Plan and amend it from time to time as the Trustee determine in their sole and absolute discretion;
>
> b.    To pay or provide for the payment of Benefits in accordance with the Plan, and to determine the manner of payments of such benefits;
>
> c.    To process and approve or deny claims for the Benefits, determining whether the conditions for the payments of Benefits as set forth in this Third Agreement and the Plan have been fulfilled and whether any exceptions or exclusions are applicable. . . .
>
> e.    To decide in the Trustee's sole discretion, all questions (both factual and legal) relating to the eligibility or rights of Participants or Beneficiaries for Benefits under the plan. And the amount and kind of all benefits to be paid under the plan;
>
> f.    To interpret, in the Trustee's sole discretion, all terms in this Trust Agreements or in the Plan, including the resolution or clarification of any ambiguities, omissions or inconsistencies;
>
> g.    To make, amend, modify or repeal rules and regulations which the Trustees, in their sole discretion, deem necessary or proper for administering the Plan or carrying out the provisions of the Trust Agreement.

III.    The Claims

a.    Patient P.S.

Patient P.S. was a 71-year old male, and long-time smoker who was admitted to Mercy

on April 16, 2015, as an inpatient. Am. Compl. ¶ 13.  P.S. was found to have bilateral pulmonary

embolism and right hilar mass with significant lymph adenopathy. Id. P.S. was treated by Dr.

Andaz from April 16, 2015 through April 23, 2015. Id. ¶ 15.

During the time of treatment, P.S. presented documentation indicating that Defendant was contractually required to pay for the health services provided when P.S. incurred liability. Am. Compl. ¶ 16. Also, at that time, P.S. executed documents purportedly assigning to Plaintiffs all rights to receive reimbursement for the health care services. Id. Plaintiffs agreed to provide medical care to P.S. with the understanding that they would receive payment in full for the services from Defendant on P.S.'s behalf.  Am. Compl. ¶ 22. To date, Plaintiffs have not been paid in full. Id. ¶¶ 25, 30.

b.      Patient W.D.

In or around March 14, 2015, patient W.D. was admitted through the emergency room at SNHC where he presented with serious health conditions including enlargement of the lymph nodes. Am. Compl. ¶¶ 32-33. From March 14, 2015 through March 23, 2015, W.D. was treated by Dr. Andaz and/or Frank Smith ("Smith"), a PA employed by LI Thoracic. Id. ¶ 34.

During the time of treatment W.D. presented documentation indicating that Defendant was contractually required to pay for the health services provided when W.D. incurred liability. Am. Compl. ¶ 35. Also at that time, W.D. executed documents purportedly assigning to Plaintiffs all rights to receive reimbursement for health care services. Id. Plaintiffs agreed to provide medical care to W.D. with the understanding that they would receive payment in full for the services from Defendant on W.D.'s behalf.  Am. Compl. ¶ 40. To date, Plaintiffs have not been paid in full. Id. ¶¶ 43, 50.

c.      Patient W.E.

From June 2013 through April 2014, patient W.E. was provided medical care by Dr. Andaz and/or Smith. Am. Compl. ¶ 52. During the time of treatment, W.E. presented documentation indicating that Defendant was contractually required to pay for the health services

provided when W.E. incurred liability.  Id. ¶ 53. Also, at that time, W.E. executed documents purportedly assigning to Plaintiffs all rights to receive reimbursement for the health care services. Id. To date, Plaintiffs have not been paid in full. Id. ¶¶ 62, 68.

IV.    The Plan

A Summary Plan Description (SPD) sets forth the benefits provided by the Fund. In its opening section under Important Notice the SPD states:

> This booklet is the Summary Plan Description (SPD) of the plan of benefits ("the Plan") of the Building Service 32BJ Health Fund ("the Fund") with regard to the Metropolitan and Suburban Plans. Your rights to benefits can only be determined by this SPD, as interpreted by official action of the Trustees ("the Board"). . . .
>
> In the event there is any conflict between the terms and conditions of the Plan benefits as set forth in this booklet and any oral advice you receive from a Building Service 32BJ Funds employee or union representative, the terms and conclusions set forth in this booklet shall control.

With regard to the discretionary authority vested with the Fund administrators the SPD provides that:

> The Plan is what the law calls a "health and welfare: benefits program. Benefits are provided from the Fund's assets. Those assets accumulated under the provisions of the Trust Agreement and ae held in a Trust Fund for the purpose of providing benefits to covered participants and dependents and defraying reasonable administrative expenses.
>
> The Plan is administered by a Board of Trustees. The Board governs the Plan in accordance with an Agreement and Declaration of Trust. The Board and/or its duly authorized designess(s) has the exclusive right, power and authority, in its sole and absolute discretion, to administer, apply and interpret the Plan established under the Trust Agreement, and to decide all matters arising in connection with the operation or administration of the Plan established under the Trust. Without limiting the generality of the foregoing the Board and/or its duly authorized designees, including the Appeals committee with regard to benefit claim appeals, shall have the sole and absolute discretional authority to:
>
> *take all actions and make all decisions with respect to the eligibility for, and the amount of, benefits payable under the Plan.

*formulate, interpret and apply rules, regulations and policies necessary to administer the Plan in accordance with the terms of the Plan.

*decide questions, including legal or factual questions, relating to the calculation and payment of benefits under the Plan.
*resolve and/or clarify an ambiguities, inconsistencies and omissions arising under the Plan, as described in this SPD, the Trust Agreement or other Plan documents.

*process and approve or deny benefit claims and rules on any benefit exclusions.

*determine the standard of proof required in any case.

The SPD provides for benefits at different levels depending as to whether the treating physician

is in-network or out-of-network. The SPD defines and out-of-network provider as:

**Out-of-network** provider/supplier means a doctor, other professional provider or durable medical equipment, home, health, care or home infusion supplier who is not in the Plan's network for medical, hospital, vision, dental or behavioral health services. **Out-of-network** benefits are benefits for covered services provided by **out-of-network** providers and suppliers.

The SPD further provides that:

Care that is provided by an **out-of-network** provider is considered out-of-network care and, as such, reimbursed at a lower level. If you use **out-of-network** providers, you must first satisfy the annual **deductible** before being reimbursed at 70% of the **allowed amount**. Amounts above the allowed amount are not eligible for reimbursement and are your responsibility to pay, in addition to any deductible and required co-insurance, if you use an out-of-network provider ask your provider if he or she will accept Empire's payments as payment in full (excluding your deductible or co-insurance requirements).

In the section titled "Frequently asked questions", the SPD states:

**10.    What is the allowed amount?**

The **allowed amount** is not what the doctor charges you. It is the amount that the Plan will pay for covered services, and it is generally a much lower amount than the doctor charges you. When you go **in-network**, the **allowed amount** is based on an agreement with the provider. When you go out-of-network, the allowed amount is based on the Fund's payment rate charge to a **network** provider.

6

Finally, the SPD provides that only health benefits under the Plan may be assigned, and only to a health care provider. Def.'s 56.1 ¶ 9, DE [38].

V.    The Assignments

Defendant contends that it has no record of any assignment of benefits to Plaintiffs for patient P.S., and that none has been provided by Plaintiffs. Def.'s 56.1 ¶ 10. Plaintiffs dispute that and maintain that all services provided to P.S. were rendered exclusively when he was in the hospital and that the Fund received and paid for claims related to P.S.'s inpatient hospital stay, "for which an assignment was likely executed by P.S. that was inclusive of all services received in the hospital." Pls.' 56.1 ¶ 10, DE [42].

There is no dispute that W.D. and W.E. executed assignment forms. The assignment forms read as follows:

> **ASSIGNMENT OF INSURANCE BENEFITS:** Patients with insurance benefits please read and sign below.
>
> I hereby assign all medical and/or surgical benefits, to include major medical benefits to which I am entitled, private insurance, and any other health plans, to Long Island Thoracic Surgery, PC. This assignment will remain in effect until revoked by me in writing. A photocopy of this assignment is to be considered as valid as the original. I understand I am financially responsible for charges whether or not paid by said insurance. I hereby authorize said assignee to release all information necessary to secure payment.

Def.'s Mot., Affidavit of Peggy Napier ("Napier Aff.") ¶ 10, DE [41]. This assignment, signed by W.D. is dated August 17, 2015. Id. W.D. signed a second document dated August 15, 2015, which stated:

> **ASSIGNMENT of BENEFITS PROCEEDS:**
>
> I hereby assign to Dr. Stewart Fox and/or Dr. Shahriyour Andaz, all monies and/or benefits to which I am entitled from my insurer/HMO/third-party payer or government agencies, or those who are financially liable for my medical care. If I receive payment for these services from my insurer I will immediately endorse

checks and deliver in person or by mail to LONG ISLAND THORACIC
SURGERY, P.C.

Id. W.E. signed off on identical forms. Id.

VI.     The Claims Appeals

The Fund maintains an internal appeals process which is administered by Empire. For a

short period of time the appeals process was administered by Cigna. All parties agree that for the

claims which are the subject of this case, the appeals process has been exhausted. All parties also

agree that Dr. Andaz did not contact the Fund before performing the medical procedures on each

of the three patients. Def.'s 56.1 ¶ 28.

It is undisputed that Dr. Andaz had no written contact with the Fund to provide benefits

service/care for the three patients. The administrative record for all three patients mostly consist

of the invoices submitted by Plaintiffs, medical records, the responses of the claims adjudicators

(Empire and Cigna), and correspondence to and from Plaintiffs, mostly concerning settlement

proposals. Plaintiffs submitted various form letters in support of its various appeals. For

example, for P.S., in response to an invoice from Plaintiffs for a consultation fee of $9,856.59,

the Fund, through Empire, advised P.S. that $138.41 was payable with the following notations:

> 1.     We have paid this claim to the provider at the in-network-benefit level.
> This provider does not participate with your plan; therefore, you may be billed for
> the difference between the provider's charge and our payment. You are
> responsible for any in-network co-pay, deductible and co-insurance amounts. If
> you are billed for any amount other than your in-network co-pay, deductible, and
> co-insurance amounts, please contact us.

> 2.     Empire HealthChoice Assurance, Inc. provides administrative claims
> payment services only, with no financial risk or obligation with respect to claims.

Napier Aff. ¶ 12.

For W.D. there was a more detailed correspondence, with W.D. submitting his own appeal letters. The Fund compared the charges attributed to W.D. with the Medicare Reimbursement Rates and found same to be in line. The same analysis was performed for W.E.

W.E. submitted a number of letters of appeal, asserting:

> CIGNA has a legal obligation as my insurer to cover these out-of-network provider charges. The primary reason for me obtaining medical insurance from CIGNA was to have my medical expenses covered completely as designated by the State Insurance Commission.

Napier Aff, ¶ 13.

The Fund's response to each post-decision correspondence was with an offer of settlement also using a "form" letter. The form letter formats read almost the same for all claims. The Fund's form letter typically stated as follows:

> I am writing in reference to the services performed by you from _____ to and for the above referenced patient who is covered by the Building Service 3BJ Health Fund (Fund). This patient has a self-funded benefit plan through the Fund which allows negotiation to a maximum of 500% of Medicare's payment rate for CPT codes performed for this patient. It is our understanding that these services were provided on an emergent or involuntary basis which prevented the 32BJ member from securing the services of a participating CIGNA OAP physician. We recognize that these circumstances can occur on emergency as well as some scheduled procedures. The total charged by your office for these codes performed was _____. In an effort to offer you a fair and reasonable reimbursement for your services the Fund is agreeing to reimburse you at 500% of the Medicare reimbursement rate for these services.

Napier Aff. ¶ 14.

Plaintiffs' response to the offers of settlement of the claims, typically read along the following lines:

Negotiation request at 100%

Dear Concerned,

We regret to inform you that after careful consideration we are unable to accept your adjudication of the above Mentioned claim whereby payment $138.41 (EOB Dated: 4/2/2015) is full settlement.

As a non-participating provider with your health plan (Dr. Shahriyour Andaz) I do not accept your assignment as a full settlement of claim, here this legally and lawfully enables us to negotiate the claim at the proposed rate.

Please be advised that Section 3224 of the New York Insurance Law, (New York State Prompt Pay Regulations) requires payment of claims within 45 days of receipt.

And extended to non-participating providers, Section 3324a Standards for prompt, fair and equitable settlement of claims for health care and payments for health care services obligate payers to fully satisfy the level of care as filed when documented, within the appropriate time frame for filing and or reconsideration, and any case non-compliance of this may cause prosecution of Payer by NY State Department of Insurance.

Please note the patient was provided Emergency Life Saving Surgery in good faith and we should be reimbursed accordingly. Furthermore, since this was Emergency Treatment there is No Prior Authorization required.

Thank you for your time and assistance in addressing this issue.

Should you have any questions please feel free to contact us at (347)732-1370 x. 796.

Regards,
Long Island Thoracic Surgery P.C.

Napier Aff. ¶ 15.

For claims not provided on an emergency basis, Plaintiffs' settlement proposals typically

read as follows:

**Negotiation at 90% Percent**

Dear Concerned,

We regret to inform you that after careful consideration we are unable to accept your adjudication $1,016.59 for the above mentioned claim as full settlement.

This being a fact that being a non-participating provider with y our health plan (Dr. Shahriyour Andaz) we do not accept your assignment as a full settlement of

claim, here this legally and lawfully enables us to negotiate the claim at the proposed rate.

Please be advised that Section 3224 of the New York Insurance Law, (New York State Prompt Pay Regulations) requires payment of claims within 45 days of receipt, except in cases where the obligation to pay is not clear, however you are obligated to pay any undisputed portion of the claim within 45 days,

And extended to non-participating providers, Section 3324a Standards for prompt, fair and equitable settlement of claims for health care anti payments for health care services obligate payers to fully satisfy the level of care as filed when documented, with in the appropriate time frame for filing and or reconsideration, under any case of incompliance of which may cause prosecution of Payer by NY State Department of Insurance.
As a non-par provider we have the right to negotiate with you to an extent, being enlightened with all the facts and possibility we request you to release the payment of the rate (90%) we are questioning at your earliest.

Here are the attached examples from Blue Cross Blue Shield on which you will find out how they are responding as they can negotiate at 90% for the same services.

Thank you for your time and assistance in addressing this issue, if you have any questions please feel free to contact us at (347)732-1370 ext.546.

Regards,
Long Island Thoracic Surgery P.C.

Attachments:

Proof of Payment @ 90% from BCBS.

VII.   The Letters

The Fund is administered by trustees who, under ERISA, must act as fiduciaries in the

sole interest of the Fund's participants and beneficiaries and for the sole purpose of providing

benefits to those participants and beneficiaries. In carrying out these obligations, the trustees

developed a system of network providers to provide the maximum benefits obtainable based

upon the limited monies received from contributing employers. Contributions are based upon

negotiated amounts employers are willing to contribute under the union collective bargaining

agreements. However, in order to all the participants options, the plan allows the participant to use out-of-network providers with the understanding that excess will be the participant's responsibility.

There are situations where a participant is forced to use an out-of-network provider, without the opportunity to opt for an in-network provider. This situation can occur when a participant uses the emergency room at an in-network facility and is assigned a specialist who is out-of-network. In such situations, the participant is not in a position to choose to be seen only by an in-network physician and as a consequence the participant unknowingly can face surprising and unexpected charges not covered by the Plan. In such circumstances, the Fund attempts to negotiate a reasonable fee payment with the out-of-network provider, which is in excess of the allowed amounts under the Plan. The parties do not dispute that the described negotiation process took place with regards to these claims.

SNCH and Mercy are both in-network providers under the Plan. The Fund has pre-negotiated specific discounted rates for the services provided by each hospital. However, the three participants were assigned Plaintiffs as thoracic surgery specialists, even though Plaintiffs are out-of-network.

On or about September 22, 2015 and October 9, 2015, the Fund sent letters to Mercy and SCNH regarding Dr. Andaz and his billing practices. The letter to Mercy states:

> Building Service 32BJ Health Fund (Fund) would like to file a formal complaint against Dr. Shahriyour Andaz, a thoracic surgeon who has admitting privileges at your facility regarding his overbilling for hospital consultative services for patient P.S. a 32BJ member, who resides at _____.
>
> **A summary of this complaint is as follows;**
>
> Patient P.S. was admitted through the Emergency Room to Mercy Medical Center in Rockville Center, NY. During patient's stay in the hospital from 04-15-15 to 04-23-15, Dr. Andaz performed an inpatient consultation for this member on

4/1/7/15 [sic]. The member had no choice in using this non-participating provider since the member was in a hospital bed at the time.

Dr. Andaz' total charges for this visit billing with code# 99255-(INITIAL INPATIENT CONSUNLATION FOR A NEW OR ESTABLISHED PATIENT. WHICH REQUIRES 3 KEY COMPONENETS: A COMPREHENSIVE HISTORY. A COMPREHENSIVE EXAMINATION AND MEDICAL DECISION MAKING OF HIGH COMPLEXITY) were $9,995.00. Empire BlueCross BlueShield (Empire), on behalf of the Fund, reimbursed $138.41. This reimbursement rate was based on Empire's in network PPO rate for a participating provider. Dr. Andaz's billing department contacted Empire and requested that this claim be reimbursed at 100% of charges. Since the provider's billing department would not negotiate a reasonable payment rate with Empire after several attempts the claim was forwarded by Empire to the Fund for negotiation with this provider. On 08-20-15 the Fund made an attempt through correspondence by fax to negotiate with this provider at 500 percent of the Medicare rate of payment for this service totaling $1,155.00 as payment, which also represents more than the 95th percentile of Fair Health's reimbursement for this procedure code on Long Island.

On Aug 20, 2015 the Fund received a response from the provider's billing department asking the Fund to release 90% of total charges. Unfortunately, the Building Services 32BJ Fund (Fund) cannot agree to Dr. Andaz's request of 90% on his $9,955.00 charges. The Fund believes that the charges are significantly out of line when comparing them to the Fair Health organization's data on provider payments in New York. 32BJ Health Fund is a self-funded Welfare Truth Fund that administrates benefits for over 175,000 union members and their dependents. We manage how the Fund's dollars are spent insure we are not inappropriately paying providers with charges that are far in excess of reasonable charges in the market. We also believe that this type of unconscionable billing by Dr. Andaz is a driving factor in the health care crisis today making it more expensive for employers and unions to provide their employees and members with comprehensive health care coverage.

We would appreciate your investigation in this matter since this provider has staff privileges at your facility and that you take appropriate action with this provider so, other patients are not placed in financial jeopardy by his inappropriate billing practices….

Napier Aff. ¶ 20. The Fund cc'd the letter to the New York State Department of Health, Office of

Professional Medical Conduct. Id.

The October 9, 2015 letter to SNCH reads similarly and states:

Building Service 32BJ Health Fund (Fund) would like to file a formal complaint against Dr. Shahriyour Andaz, a thoracic surgeon who has admitting privileges at your facility. We believe that Dr. Andaz is overbilling for hospital consultative services and medical-surgical procedures performed for patient W.D. a 32BJ member, who resides at _____ .

A summary of this complaint is as follows;

Patient William Daugherty was admitted through the Emergency Room to South Nassau Communities Hospital I Health Way, Oceanside, NY. During the patient's stay in the hospital from 3/09/15 to 03/24/15, Dr. Andaz performed an inpatient consultation for this member on 03/14/15, 03/17/15, 03/19/15 03/20/15 and 03/21/15. On 3/19/15 the provider performed a medical procedure on this patient with the inpatient consultation. The member had no choice in using this non-participating provider since the member was in a hospital bed at the time. Dr. Andaz's charges for these billing codes are excessively high.

For example:

| Code | Description | Provider Charges |
|---|---|---|
| 992333 25 | (INITIAL INPATIENT CONSULATATION FOR A NEW OR ESTABLISJED PATIENT, WHICH REQUIRES 3 KEY COMPONENTS: A COMPREHENSIVE HISTORY, A COMPREHENSIVE EXAMINATION AND MEDICAL DECISION MAKING OF HIGH COMPLEXITY | $9,995.00 |
| 39400ET | (MEDIASTINOSCOPY, WITH OR WITHOUT BIOPSY) | $135,000.00 |
| 31622 59 | (BRONCHOSCOPY, RIGID OR FLEXIBLE. DIAGNOSTIC, WITH OR WITHOUT CELL WASHING (SEPARATE PROCEDURE) | $30,000.00 |
| 99255 | Inpatient consultation for a new or established patient, which requires 3 key components: A comprehensive history) | $9,995.00 |

The total charges by Dr. Andaz for patient care from 03/14/15 through 03/21/15 were $234,965.00. Empire BlueCross BlueShield (Empire) processed these claims on behalf of the Fund based on Empire's in network PPO rate for a participating provider, and made a total payment of $1,181.55. Dr. Andaz's billing department contacted Empire and requested that this claim be reimbursed at 100% of charges. Since the provider's billing department would not negotiate a reasonable payment rate with Empire after several attempts the claim was forwarded by Empire to the Fund for negotiation with this provider. On 06-27-15 the Fund made an attempt through correspondence by fax to negotiate with this provider at 500 percent of

the Medicare rate of payment for dais[sic] service totaling $10,893.72 as payment in full, which also represents more than the 95th percentile of Fair Health's reimbursement for this procedure code on Long Island.

In August 2015 the Fund received a phone call from the provider's billing department asking the Fund to release the payment at 90% of total charges. The Fund cannot agree to Dr. Andaz's request of 90% on his charges. The Fund believes that the charges are significantly out of line when comparing them to the Fair Health organization's data on provider payments in New York.

32BJ Health Fund is a self-funded Welfare Truth Fund that administrates benefits for over 175,000 union members and their dependents. We manage how the Fund's dollars are spent to insure we are not inappropriately paying providers with charges that are far in excess of reasonable charges in the market. We also believe that this type of unconscionable billing by Dr. Andaz is a driving factor in the health care crisis today making it more expensive for employers and unions to provide their employees and members with comprehensive health care coverage.

We would appreciate your investigation in this matter since this provider has staff privileges at your facility and that you take appropriate action with this provider so, other patients are not placed in financial jeopardy by his inappropriate billing practices….

Napier Aff. ¶ 21. As with the September 22, 2015, the Fund cc'd the letter to the New York State

Department of Health, Office of Professional Medical Conduct. Id.

VIII.    Defamatory Statements

Dr. Andaz asserts that the Fund's September 22, 2015 and October 9, 2015 letters to

Mercy and SNCH contained untruths. Specifically, Dr. Andaz contends that his rates "are what I

feel I should get paid as a cardiothoracic surgeon with tremendous experience and responsibility

to take care of sick patients..." Deposition Transcript of Shahriyour Andaz, M.D. ("Dr. Andaz

Tr.") 41:19-22, DE [40-4]. Dr. Andaz feels that the he was not over billing as the Fund stated in

the letters and that he was entitled to his rates. Id. 43:12-44:20. Dr. Andaz also believes that he is

"not responsible for driving costs up. Totally wrong. I disagree. I'm not responsible for that,

okay." Id. 52:2-13.

In sum and substance, Dr Andaz finds the following to be untruthful in the letters:

Q. What is untruthful in this letter?

     Mr. Bretenbach: Objection.

     You may answer.

A. Okay, so this letter that went to the Office Of Professional Misconduct and to the chief medical officer, okay, saying that I'm overbilling, yet I'm getting - - my billing is what I'm getting paid for. My billing is standardized. I have a lot of experience. I work very hard. My bills are excessive and it's hard to stay in practice, so my billing is totally appropriate for the level of care and the level of expertise that I have and the years of experience that we put into this.

Dr. Andaz Tr. 55:6-19.

IV.    Procedural History

     Plaintiffs commenced this action in Nassau County Supreme Court on September 15, 2016 by filing their Summons and Notice. Pls.'56.1 ¶ 22. On January 9, 2017, Plaintiffs filed the complaint and served the Fund with an Amended Summons and Complaint. Affidavit of Ira A. Sturm ("Sturm Aff."), Ex. C and F, DE [40-3], [40-6]. On January 13, 2017, the Fund removed the action to this Court. DE [1]. On March 3, 2017 Plaintiffs filed an Amended Complaint, see DE [9], which the Defendant answered on March 8, 2017. DE [10].

V.    The Motion for Summary Judgment

     Defendant moves for summary judgment as to all of Plaintiffs' claims. Defendant argues that Plaintiffs ERISA causes of action fail because the Court's review is limited to the administrative record under a test of whether the Fund's decisions were arbitrary and capricious. Defendant also asserts that Plaintiffs lacks standing to sue on behalf of patient P.S.

     Defendant contends that Plaintiffs' state law claims for breach of express and implied contract, unjust enrichment and violation under the Prompt Pay Act fail because Plaintiffs lack standing to assert such claims. Defendant argues that the assignments extend only to medical

benefits and not to statutory or contractual rights. Defendant further asserts that Plaintiffs' state law causes of action are pre-empted by ERISA.

Finally, Defendant argues that Plaintiffs' claims for defamation are time-barred and lack evidentiary support.

Plaintiffs argue that ERISA does not govern their claims but even if did, the Fund's actions are established to have been arbitrary and capricious. Plaintiffs assert that this case only involves the amount of benefits available under the Plan, and therefore their state law claims for breach of contract and unjust enrichments are not preempted by ERISA. Finally, Plaintiffs contend that their defamation claim is also not preempted by ERISA, nor is it time-barred.

Having summarized the facts and the parties' positions the Court turns to the merits of the motion.

<u>DISCUSSION</u>

I.   <u>Legal Principles: Standards on Summary Judgment</u>

Summary judgment is appropriately granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>SCR Joint Venture L.P. v. Warshawsky</u>, 559 F.3d 133, 137 (2d Cir. 2009). A fact is "material" if it might affect the outcome of the litigation under the relevant law. <u>Id</u>. The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 322. Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002) (quoting Celotex, 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all reasonable inferences against the moving party". Tolbert v. Smith, 2015 WL 3875237 *4 (2d Cir. 2015); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise, Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995), and must do more than show that there is "some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  Instead, the non-moving party must "set forth significant, probative evidence on which a reasonable fact-finder could decide" in her favor. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256–57 (1986).

II.    ERISA Claims

A.    Plaintiffs' Standing to Pursue ERISA Claims

Plaintiffs' first cause of action is pursuant to section 502(a)(1)(B) of ERISA, which allows a "participant or beneficiary" to sue "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). Plaintiffs' second cause of action is pursuant to section 502(g)(1) of ERISA, which provides that, "[i]n any action under [section 502] ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). "Section 502(a)(1)(B) limits the class of individuals who can sue to recover benefits due ... to those individuals who are 'participants' or 'beneficiaries' of a benefits plan." Simon v. Gen. Elec. Co., 263 F.3d 176, 176 (2d Cir. 2001). The Supreme Court has held that only the parties set forth in section 502 may sue for relief under that section. Franchise Tax Bd. of State of Cal. v. Const. Laborers Vacation Trust for

S. Cal., 463 U.S. 1, 27, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983). The Second Circuit has carved out a "narrow exception" to this general rule: "healthcare providers to whom a beneficiary has assigned his claim in exchange for health care" also have standing under ERISA to sue for the recovery of benefits. Simon, 263 F.3d at 178. This is the narrow exception upon which Plaintiffs rely to assert their ERISA claims.

Plaintiffs argue that they have such standing because W.E. and W.D., participants in the Plan, assigned their healthcare benefits to Plaintiffs. Plaintiffs also argue that they have such standing with regard to P.S., although they have shown no evidence of such an assignment from P.S. Plaintiffs' argument that they have statutory standing to sue the Fund for the alleged underpayment of benefits with regard to P.S. hinges on the validity of the purported assignment of benefits from P.S. to Plaintiffs. See Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice HMO, Inc., 2014 WL 4058321, at *3 (S.D.N.Y. Aug. 15, 2014) ("[I]n order for [healthcare provider] plaintiffs to bring a claim related to a particular health insurance plan, plaintiffs must have obtained a valid assignment under that plan."); Neuroaxis Neurosurgical Associates, PC v. Costco Wholesale Co., 919 F. Supp. 2d 345, 351 (S.D.N.Y. 2013) ("In order for an assignee to prevail on an ERISA claim ..., the assignee must establish the existence of a valid assignment agreement that comports with the terms of the welfare benefits plan."). If the assignment is valid, the Plaintiffs have standing; if the assignment is invalid, they do not.

Here, Plaintiffs have failed to produce any evidence of an assignment on P.S.'s behalf, let alone a valid one. In apparent recognition of this fact, Plaintiffs argue that the fact that the Fund already rendered partial payment on the claim is evidence that the Fund waived any objection and accepted the assignment of benefits to Plaintiffs. However, the fact that the Fund paid Plaintiffs for out-of-network services does not constitute a waiver. See Merrick, 175 F. Supp. 3d

at 122–26 (insurer's direct payment to healthcare provider, did not constitute a waiver of provisions prohibiting plan member from assigning his benefits).

Accordingly, it is respectfully recommended that Plaintiffs lack standing to pursue their ERISA claims on behalf of P.S. The Court turns to consider arguments relevant to the claims of W.E. and W.D.

B.    ERISA Preemption

There are "two parallel and independent forms" of ERISA preemption. Wurtz v. Rawlings Co., LLC, 933 F. Supp. 2d 480, 489 (E.D.N.Y. 2013). Complete preemption applies where Congress has so "completely pre-empt[ed] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." Bloomfield v. MacShane, 522 F. Supp. 2d 616, 620 (S.D.N.Y. 2007) (quoting Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63–64, 107 S. Ct. 1542, 95 L. Ed. 2d 55 (1987)) (internal quotation marks omitted). In contrast, express preemption applies where a federal law "contains an express preemption clause," requiring the court to "'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." Chamber of Commerce of U.S. v. Whiting, 563 U.S. 582, 594, 131 S. Ct. 1968, 1977, 179 L. Ed. 2d 1031 (2011) (quoting CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S. Ct. 1732, 123 L. Ed.2 d 387 (1993)).

1.    Complete Preemption

ERISA was enacted to "'protect ... the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" Aetna Health Inc. v. Davila, 542 U.S. 200, 208, 124 S. Ct. 2488, 159 L. Ed. 2d 312

(2004) (quoting 29 U.S.C. § 1001(b)) (alteration in original). Its main objective "is to provide a uniform regulatory regime over employee benefit plans." Id.; see also N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656–57, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995) ("Congress intended 'to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government ..., [and to prevent] the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.' " (alterations in original) (quoting Ingersoll–Rand Co. v. McClendon, 498 U.S. 133, 142, 111 S. Ct. 478, 112 L. Ed. 2d 474 (1990))).

To provide such uniformity, the statute contains broad preemption provisions, which safeguard the exclusive federal domain of employee benefit plan regulation. See Davila, 542 U.S. at 208, 124 S. Ct. 2488; see also Alessi v. Raybestos–Manhattan, Inc., 451 U.S. 504, 523, 101 S. Ct. 1895, 68 L. Ed. 2d 402 (1981). One such source of preemption under ERISA is § 502(a)(1)(13), which serves as ERISA's main enforcement tool in ensuring a uniform federal scheme:

> A civil action may be brought—(1) by a participant or beneficiary—... (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan

29 U.S.C. § 1132(a)(1)(13).

The Supreme Court has explained that "the detailed provisions of § 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54, 107 S. Ct.

1549, 95 L. Ed. 2d 39 (1987). "[T]he inclusion of certain remedies and the exclusion of others

under [§ 502's] federal scheme ... provide[s] strong evidence that Congress did not intend to

authorize other remedies that it simply forgot to incorporate expressly." Id. (quoting Mass. Mut.

Life Ins. Co. v. Russell, 473 U.S. 134, 146, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985)). Likewise,

the Supreme Court has acknowledged that "the federal scheme would be completely undermined

if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that

Congress rejected in ERISA." Id.

For this reason, where a plaintiff brings a state law claim that is "within the scope"

of ERISA § 502(a)(1)(B), ERISA's preemption power will take effect. See Davila, 542 U.S. at

209, 124 S. Ct. 2488. The effect of this preemptive power cannot be understated: it "prevents

plaintiffs from 'avoid[ing] removal' to federal court 'by declining to plead necessary federal

questions.'" Arditi v. Lighthouse Int'l, 676 F.3d 294, 298–99 (2d Cir. 2012) (quoting Romano v.

Kazacos, 609 F.3d 512, 519 (2d Cir.2010)) (alteration in original).

The test for assessing whether a claim is "within the scope of" ERISA § 502(a)(1)(B),

and therefore completely preempted, consists of two parts:

> claims are completely preempted by ERISA if they are (i) brought by "an
> individual [who] at some point in time, could have brought his claim
> under ERISA § 502(a)(1)(B)," and (ii) under circumstances in which "there is no
> independent legal duty that is implicated by a defendant's actions."

Montefiore Med. Ctr. v. Teamsters Local 272, 642 F.3d 321, 328 (2d Cir.

2011) (quoting Davila, 542 U.S. at 210, 124 S. Ct. 2488); see also Davila, 542 U.S. at 210, 124

S. Ct. 2488 ("[I]f an individual ... could have brought his claim under ERISA § 502(a)(1)(B), and

where there is no other independent legal duty that is implicated by defendant's actions, then the

individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)."); Metro.

Life, 481 U.S. at 65–66, 107 S. Ct. 1542 (noting that section 502(a)(1)(B) of ERISA contains

"extraordinary pre-emptive power" that "converts an ordinary state common law complaint into one stating a federal claim," making "causes of action within the scope of ... § 502(a) ... removable to federal court").

Additionally, "[t]o avoid potential confusion under the first prong of Davila, [the Second Circuit] has further clarified that the plaintiff must show that: (a) he is the type of party who can bring a claim pursuant to § 502(a)(1)(B) of ERISA; and (b) the actual claim asserted can be construed as a colorable claim for benefits pursuant to § 502(a)(1)(B)." Arditi, 676 F.3d at 299. Where both of Davila's factors are satisfied—including the two sub-parts to Davila's first prong—ERISA will preempt the state law claim. Id. (citing cases).

i.      Davila Prong One

The Court first addresses whether Plaintiffs are "the *type* of party that can bring a claim" under § 502(a)(1)(B); it then considers "whether the *actual claim*" at issue constitutes a "colorable claim" for benefits under § 502(a)(1)(B). Montefiore, 642 F.3d at 328 (emphasis in original); see also Josephson v. United Healthcare Corp., 2012 WL 4511365, at *3 (E.D.N.Y. Sept. 28, 2012) (acknowledging the Second Circuit's interpretation of Davila's two-pronged test as consisting of two inquiries under the first prong).

a.      Type of Party

As previously set forth, § 502(a)(1)(B) clearly provides that a civil action may be brought (1) "by a participant or beneficiary" of (2) an ERISA employee benefit plan. 29 U.S.C. § 1132(a)(1)(B). It is not disputed that the Plan is an employee welfare benefit plan under ERISA. See 29 U.S.C. § 1002(1). Although Plaintiffs are not direct participants in or beneficiaries of the plan, "[a] healthcare provider may stand in place of the beneficiary to pursue an ERISA claim if the beneficiary has assigned his or her rights to the provider in exchange for

medical care." Neuroaxis Neurosurgical Assocs., PC v. Cigna Healthcare of N.Y., Inc., 2012 WL 4840807, at *3 (S.D.N.Y. Oct. 4, 2012). Here there is no dispute that W.E and W.D. assigned their right in exchange for care and accordingly, Plaintiffs are the type of party who could bring an ERISA claim. Healthcare providers who receive valid assignments of the right to reimbursement from their patients have standing to sue under ERISA. See Simon v. General Elec. Co., 263 F.3d 176, 177-78 (2d Cir. 2001); The Plastic Surgery Group, P.C. v. United Healthcare Ins. Co. of N.Y., Inc., 64 F. Supp. 3d 459, 465 (E.D.N.Y. 2014); Neuroaxis Neurosurgical Assocs., PC v. Cigna Healthcare of N.Y., 2012 WL 4840807, at *3 (S.D.N.Y. Oct. 4, 2012). Accordingly, Plaintiffs are the type of party who can bring an ERISA claim, and Prong One, Step One of the Davila preemption test is satisfied.

### b.    Colorable Claim

The Court next considers whether Plaintiffs' claims might be considered colorable claims for benefits under ERISA § 502(a)(1)(B). Montefiore, 642 F.3d at 330. The Second Circuit distinguishes between claims involving the "right to payment" and claims involving the proper "amount of payment." See id. at 331. Right-to-payment claims "implicate coverage and benefits established by the terms of the ERISA benefit plan" and can be brought under § 502(a)(1)(B). Id. Generally, a plaintiff's claims should be placed in the right-to-payment category where "the meaning of the plan language is disputed and requires the Court's interpretation." Enigma, 994 F. Supp. 2d at 298 (quoting Neuroaxis, 2012 WL 4840807, at *4); see also Plastic Surgery Group, 64 F. Supp. 3d at 467 (claims implicate right to payment where "there is no question that the Court will need to interpret the language of the Plan to resolve this dispute"); Olchovy v. Michelin N. Am., Inc., 2011 WL 4916891, at *4 (E.D.N.Y. Sept. 30, 2011), report and recommendation adopted sub nom. Olchovy v. Michelin Northamerica, Inc., 2011 WL 4916564

(E.D.N.Y. Oct. 17, 2011) ("<u>Montefiore</u> ... teaches that a dispute is a colorable claim for benefits under ERISA when its resolution depends on an interpretation of the terms of an ERISA-governed ... plan; that is, when, in order to determine whether the plaintiff is entitled to relief, the court must look to the terms of the ... plan[ ] itself.").

Amount-of-payment claims, on the other hand, are those "regarding the computation of contract payments or the correct execution of such payments," and are typically construed as falling outside of Section 502's purview. <u>Montefiore</u>, 642 F.3d at 331. A court will classify a plaintiff's claims as amount-of-payment claims "where the basic right to payment has already been established and the remaining dispute only involves obligations derived from a source other than the [ERISA-governed benefit plan]." <u>Id.</u> Amount-of-payment claims often "depend on extrinsic sources used for the calculation, and are commonly tied to the rate schedules and arrangements included in provider agreements." <u>Neuroaxis</u>, 2014 WL 4840807, at *4 (citing <u>Montefiore</u>, 642 F.3d at 331; <u>Lone Star OB/GYN Assocs. v. Aetna Health Inc.</u>, 579 F.3d 525, 530-31 (5th Cir. 2009)). "The need to reference plan language does not turn an amount of payment claim into a right to payment claim unless the meaning of the plan language is disputed and requires the Court's interpretation." <u>Id.</u> (citing <u>Lone Star</u>, 579 F.3d at 530-31).

The Fund argues that this is a right-to-payment dispute because Plaintiff's' underlying right to reimbursement flows exclusively from the assigned insurance plans which are governed by ERISA, and Plaintiffs have no independent contractual relationship with the Fund. According to the Fund, because Plaintiffs and the Fund have no independent contractual relationship, it therefore follows that any right to payment, or even amount of payment allegedly due under the patients' respective health plans, can only be determined by interpretation of the plans themselves.

In analyzing the "right to payment" / "amount of payment" dichotomy, courts often consider independent agreements (i.e., in-network provider contracts, settlement agreements) because they are relevant to the question of whether or not the court must interpret contested terms of an ERISA-governed plan to resolve a dispute. See Enigma, 994 F. Supp. 2d at 301 (plaintiff's claims preempted where "the parties do not disagree about the applicable rate for [plaintiff's] services" and resolving the dispute "requires interpretation of the terms of the ERISA plan"); North Shore-Long Island Jewish Health Systems, Inc. v. Multiplan, Inc., 2012 WL 9391428, at *9 (E.D.N.Y. Nov. 8, 2012), report and recommendation modified, 953 F. Supp. 2d 419 (E.D.N.Y. 2013) (recommending that district judge remand to state court where "the Court need not interpret the Plan to resolve the disputes"); Neuroaxis, 2012 WL 4840807, at *4 (plaintiff's claims preempted where one of claims required court to "look to the plan to determine [meaning of] 'medical necessity' and ... whether it encompasses the need for an assistant surgeon with respect to the billed procedures"); Olchovy, 2011 WL 4916891, at *4-5 (plaintiff's claims not preempted where they were based on terms of independent settlement agreement and interpretation of ERISA-governed plan was unnecessary); Lone Star, 579 F.3d at 530 (plaintiff's claims not preempted where "determination of the rate that [defendant] owes [plaintiff] under the Provider Agreement does not require any kind of benefit determination under the ERISA plan"). The absence of a separate written agreement between Plaintiffs and the Fund concerning reimbursement may affect Plaintiffs' right to challenge the Fund's reliance on the Fair Health Organization's rates, but does not on its own require a characterization of this case as a "right to payment" dispute subject to ERISA.

Plaintiffs contend that the Fair Health Organization's rates for the services provided were arbitrary and artificially low, and that the Fund is referring to that as a basis for reimbursement

calculation to Plaintiffs' detriment. Plaintiffs do not argue that the Fund failed to pay the percentage of the rate specified in any of the assigned member plans, or breached any other terms of those plans; rather, Plaintiffs argue that that the Fund's reliance on the Fair Health Organization's rates is an incorrect and artificially low reference point. Whether Plaintiffs are correct or not turns on the methodology that the Fair Health Organization (which Plaintiffs did not sue) utilized to arrive at that rate; a determination does not depend upon the terms of any ERISA-governed insurance agreements assigned to him. Therefore, this is an amount-of-payment rather than a right-to-payment dispute, and Plaintiffs' claims are not ERISA § 502(a)(1)(B) claims under <u>Montefiore</u>.

Accordingly, it is respectfully recommended that Plaintiffs' state law claims are not preempted by ERISA.

C.    <u>ERISA Claims Dismissed</u>

The Amended Complaint's first two causes of action are brought pursuant to ERISA. A review of the docket indicates that Plaintiffs' original pleading, filed in state court, asserted no such claims. <u>See</u> DE [1]. Upon the removal of this action to federal court, Plaintiffs amended the complaint to include such claims.

However, in Plaintiffs' opposition to the instant motion, Plaintiffs concede that their ERISA causes of action fail "because only the amount of the payment due to Plaintiffs, and not the Plaintiffs' right to payment under the Plan is implicated." Pls.' Opp. at 11[1], DE [43]. As set forth above, this Court has considered this argument on the merits, and agrees that this is an amount of payment dispute rather than a right to payment dispute. The parties are all in

---

1. For ease of reference, all page numbers referred to reflect the ECF page number listed on the top of the document.

agreement that the Fund paid Plaintiffs for all of the claims they submitted. The only remaining issue is with respect to the amount of money paid. However, such an issue is not determined by looking to the Plan and thus, does not fall under ERISA. Therefore, in light of Plaintiffs' concession that their ERISA claims fail, and this Court's discussion and analysis above, this Court respectfully recommends that Plaintiffs' ERISA claims be dismissed.

III.   Supplemental Jurisdiction

The citizenship of the parties hereto are not diverse. Thus, Plaintiffs are from New York, and the Fund maintains its principal place of business in the same state. In light of the dismissal of Plaintiffs' ERISA claims, the Court does not have federal question jurisdiction pursuant to 28 U.S.C. § 1331. In the absence of complete diversity between the Plaintiffs and the Fund, the Court does not have jurisdiction under 28 U.S.C. § 1332. The Court respectfully recommends declining to exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. See 28 U.S.C. § 1367(c)(3); see also Shuriz Hishmeh M.D., 2017 WL 663543, at *5 (declining to exercise supplemental jurisdiction over healthcare provider plaintiff's state law claims where parties were not diverse, plaintiff lacked standing to sue under ERISA, and state claims were not preempted by ERISA); Am. Psychiatric Assoc. v. Anthem Health Plans, 50 F. Supp. 3d 157, 170 & n. 13 (D. Conn. 2014) (declining to exercise supplemental jurisdiction over plaintiff's state law claims where plaintiff lacked standing to sue under ERISA; permitting plaintiff to pursue non-preempted state claims in state court).

CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Defendants' motion for summary judgment, appearing as Docket Entry No. 37 herein, be granted in part and denied in part. Specifically, this Court recommends that: (1) Plaintiffs' lack standing to bring ERISA

claims with respect to P.S.; (2) Plaintiffs' state law claims are not preempted by ERISA; (3) Plaintiffs' ERISA claims be dismissed; and (4) the Court decline to exercise supplemental jurisdiction over Plaintiffs' state law claims.

<u>OBJECTIONS</u>

A copy of this Report and Recommendation is being provided to all counsel via ECF.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. <u>Thomas v. Arn</u>, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); <u>Caidor v. Onondaga Cnty.</u>, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").


Dated:  Central Islip, New York
        September 3, 2019

                                        /s/ Anne Y. Shields
                                        Anne Y. Shields
                                        United States Magistrate Judge